**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KENDALL MCCOOK and VIRGINIA
MCCOOK,

     Plaintiffs - Appellants,

v.

SPRINGER SCHOOL DISTRICT;
SPRINGER BOARD OF
EDUCATION; FREDDIE
CARDENAS; DAVID GUTIERREZ;
CARLOS CRAIG; RAY MCFALL;
ANDRES EBELL, in their individual
and official capacities,

     Defendants - Appellees.

No. 01-2157
(D.C. No. 99-1362 WWD/DJS)
(District of New Mexico)

**ORDER AND JUDGMENT**[*]

Before **HENRY** and **PORFILIO**, Circuit Judges, and **SAM**, District Judge.[**]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable David Sam, District Judge for the United States District Court for the District of Utah, sitting by designation.

Plaintiffs, Kendall and Virginia McCook, appeal the district court's adverse grant of two separate summary judgment motions in their 42 U.S.C. § 1983 action against Springer Superintendent Freddie Cardenas, in his individual and official capacity; Springer Board of Education members Carlos Craig, Andres Ebell, David Gutierrez, and Ray McFall, in their individual and official capacities; the Springer Board of Education; and the Springer School District (Defendants). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Mr. and Mrs. McCook, parents of Springer High School student, Jake McCook, have been frequent and outspoken critics of Defendants since 1997. The parties' differences culminated in this lawsuit shortly after Springer High School's network administrator's first day of work on October 5, 1998. On either that day, or the next, the network administrator discovered on the school's laptop computer "[m]ore than 20" audio clips from the animated cable television series "South Park." No one at the high school had instructed the network administrator to review the laptop's contents. According to his deposition testimony, he "was [just] going to dump the cache on it, to clean it out, . . . [to] speed[] up performance." He testified, "[w]henever you get a new PC, you're just curious [about] what it can do and what it has on it."

The clips found by the network administrator contained obscenities and sexually explicit language. He reported the material to Superintendent Cardenas and played the clips for him on Thursday, October 8, 1998. That day, Superintendent Cardenas called to his office Jake McCook, who admitted downloading the "South Park" clips when he possessed the computer five months earlier. Superintendent Cardenas suspended Jake for five days for improper use of a school computer. Before Jake left the Springer campus, Superintendent Cardenas issued him a disciplinary report. It reflected a parent conference was held and Jake was not to attend any school activities during his five day suspension. The district court found "[b]oth Jake and his mother understood [Jake's] suspension would take effect immediately and that Jake would not be able to attend the Homecoming pep rally the following day," Friday, October, 9, 1998.

Yet, on the morning of October 9, Jake and his father drove to the high school. The parties dispute the purpose of this visit, but it is clear Jake and Mr. McCook's ultimate goal was to admit Jake to the pep rally.

Superintendent Cardenas saw Jake and Mr. McCook enter the school and, considering Jake's suspension, he asked them to leave. They refused. A physical confrontation between Mr. McCook and Superintendent Cardenas ensued. Mr. McCook concedes he took off his hat and glasses, put his papers down and said,

"[w]hich one of you sons a bitches wants to take me on?" – but, he claims he did so only because he felt threatened by the presence of the athletic director, principal, and two custodians who had gathered in front of him. Superintendent Cardenas admits he grabbed Mr. McCook in order to escort him outside. Although the amount of physical force applied by either Mr. McCook or Superintendent Cardenas is a matter of disagreement, there is no question Jake placed himself between the two in an attempt to break Superintendent Cardenas' hold on his father. When the police arrived, the altercation had ended.

Later that same day, Superintendent Cardenas sent a letter to the Springer Police Department. It stated, "To Whom It May Concern: Kendall McCook, Virginia McCook and Jake McCook are prohibited from attending any Springer Municipal Schools functions or from trespassing onto any Springer Municipal Schools property." On Wednesday, October 14, 1998, Superintendent Cardenas sent a letter to Mr. and Mrs. McCook to inform them Jake's suspension had ended (that day). It read, "Jake may be subject to additional consequences as a result of the incident, which occurred on Friday, October 9, 1998. Mr. Kendall McCook, you are not permitted on campus at any time for any reason until further notice." Despite the omission of Mrs. McCook from this letter, she stated in her deposition, "I understood that I was barred [from the school] forever."

Based on Jake's behavior on October 9, Superintendent Cardenas made a recommendation to the Springer Board of Education that Jake be expelled and issued to the McCooks a Notice of Hearing. At the close of Jake's hearing, the evening of October 29, 1998, the School Board voted by majority to expel Jake. The Board's "Decision of the Hearing Authority" stated, in part,

> Jake McCook's conduct during the incident of October 9, 1998, constituted an assault and battery on Mr. Cardenas, interference with school personnel through threats and violence, a refusal to cooperate with school personnel, a willful refusal to leave a school facility or school-sponsored activity after being directed to do so by an administrative authority, disruptive conduct, and a violation of the terms of his prior disciplinary suspension.

Following his expulsion, Jake visited the Springer campus to obtain information about home schooling from the school counselor. Because Superintendent Cardenas understood Jake's expulsion prohibited him from entering school property, he asked the Board's attorney to write a letter to the McCooks' attorney. The November 10, 1998 letter asked Jake and Mr. McCook to honor their exclusion from Springer High School property.

Several weeks later, the McCooks brought this suit under 42 U.S.C. § 1983 against Defendants, alleging retaliation for the exercise of their First Amendment free speech rights, deprivation of their First Amendment freedoms of association and assembly, and deprivation of their Fourteenth Amendment right to equal protection of the laws. In their second amended complaint, the McCooks claimed,

- 5 -

The Defendants' actions in, among other things, barring the Plaintiffs and their son from entering onto school property, from attending school Board meetings, from voting in a school board election, from participating in athletic events held on district property, in filing baseless criminal charges against the Plaintiff, and in suspending and then expelling the Plaintiffs' son from school on scurrilous and pretextual grounds, were retaliatory in nature and were intentionally engaged in by the Defendants . . . .

Superintendent Cardenas filed a motion for summary judgment based on qualified immunity. Springer Board of Education members and the Springer Board of Education filed a separate summary judgment motion based on qualified immunity. In an unpublished memorandum opinion and order, the district court, on April 24, 2001, granted qualified immunity summary judgment in favor of Superintendent Cardenas. In a separate unpublished memorandum opinion and order filed the same day, the court granted the Board members' summary judgment motion based on qualified immunity. In that order, the court also granted summary judgment to the Springer Board of Education. Although the Springer School District is a named defendant, it did not join either Superintendent Cardenas' motion or the motion filed by the Board members and Board. Nevertheless, the School District received the benefit of the district court's May 9, 2001 judgment. It granted final summary judgment in favor of Defendants on all the McCooks' claims and dismissed the McCooks' action in its entirety. The McCooks timely appealed.

## II. STANDARD OF REVIEW

Under certain circumstances, the affirmative defense of qualified immunity shields public officials from individual liability in actions brought under 42 U.S.C. § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotations and citations omitted). It is "an *immunity from suit* rather than a mere defense to liability." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (*quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

We review the legal issues surrounding the grant of summary judgment based on qualified immunity *de novo*, considering all evidence in the light most favorable to the nonmoving parties, in this case, the McCooks. *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001).[1] Our review of "summary judgment orders deciding qualified immunity questions," however, is different than our review of "other summary judgment decisions." *Harrington*, 268 F.3d at 1185 (*quoting Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001)); *Nelson v. McMullen*, 207 F.3d 1202, 1205-06 (10th Cir. 2000). "After a defendant asserts

---

[1] Because of the First Amendment issues raised in this case, application of the *de novo* standard of review is particularly appropriate. *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1283 (10th Cir. 2002). Such issues demand our rigorous examination of the whole record. *Id.*

a qualified immunity defense, the burden shifts to the plaintiff," who must meet a two-part test before the defendant will bear the traditional burden of movant for summary judgment under Fed. R. Civ. P. 56(c). *Id.* (*quoting Medina*, 252 F.3d at 1128); *Nelson*, 207 F.3d at 1206.

First, we must determine whether the facts alleged by the McCooks, taken in the light most favorable to them, show the conduct of Superintendent Cardenas or the Springer Board of Education members (individual defendants) violated a constitutional right. *Hope v. Pelzer*, 536 U.S. __ , 122 S. Ct. 2508 (2002) (*citing Saucier*, 533 U.S. at 201). It is important that we initially determine whether there has been a constitutional violation because

> [i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case, and it is one reason for our *insisting* upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation *were a court simply to skip ahead to the question whether the law clearly established that the [official's] conduct was unlawful in the circumstances of the case.*

*Saucier*, 533 U.S. at 201 (emphasis added). If the McCooks fail to meet their threshold burden of demonstrating a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Id.* If, on the other hand, the McCooks' factual allegations add up to a violation of a constitutional right, "the next, sequential step is to ask whether the right was

clearly established at the time of the defendant's unlawful conduct[,]" such that a reasonable person in the defendant's position would have known that the alleged conduct violated the federal right. *Harrington*, 268 F.3d at 1186 (internal quotations and citations omitted); *see also* *Hope*, 122 S. Ct. 2508.

Because entity defendants are not entitled to qualified immunity, we omit its two-part test in reviewing the district court's grant of summary judgment in favor of the Springer Board of Education and, by its final judgment, in favor of the Springer School District. We engage in *de novo* review of the district court's summary judgment ruling in favor of the entity defendants, applying the same standard as the district court. *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1214 (10th Cir. 2002). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We consider the facts and all reasonable inferences drawn therefrom in a light most favorable to the nonmoving parties. *Hollander*, 289 F.3d at 1214. "In this respect, we must view the evidence in context, not simply in its segmented parts." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 921 (10th Cir. 2001) (citation omitted). Since our analysis departs, at times, from that of the district court, we remind that "[w]e are

free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001) (*quoting United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)).

### III.  DISCUSSION

### A.  First Amendment Retaliation

"[T]he purpose behind the Bill of Rights, and of the First Amendment in particular[, is] to protect unpopular individuals from retaliation--and their ideas from suppression--at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995).  Thus, "the First Amendment bars retaliation for protected speech." *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998).

In this case, the McCooks contend that in response to their complaints, lawsuits, and other objections, Defendants launched a campaign of retaliation. The McCooks' criticisms include allegations about the incompetent administration of the Springer School District, loss of students from the District and improper disciplinary practices; violations of State Board of Education policies, the Open Meetings Act, and the District's own policies; unconstitutional use of drug-sniffing dogs on the Springer campus; and the Board's wrongful restriction of public input at Board meetings.  Additionally, in June 1998, Mr.

McCook filed a lawsuit against Board member Carlos Craig because the son of the Board's President was selected as a scholarship recipient instead of the McCook's son. Several days before Jake's suspension, Mr. McCook also filed a complaint of reverse racial discrimination against the Board; he contended the Board hired a much less qualified Hispanic individual for the Springer High School English/History teacher position. Furthermore, the same day Jake was suspended, the New Mexico Athletic Association (NMAA) received an "anonymous" letter allegedly written by Mrs. McCook, in which she complained about Springer High School's principal's children participating in athletic events, without a Springer residence, in violation of NMAA rules.

First Amendment retaliation claims are generally, but not always, brought in the public employment context. *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563 (1968).[2] In this case, the McCooks are not employees of Defendants and no contractual relationship exists between the parties. We therefore employ the substantive standard we announced in *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), *cert. denied*, 533 U.S. 916 (2001). Although the facts of *Worrell* are set against a public employment

---

[2] For First Amendment retaliation cases outside the public employment context, see *Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996); *DeLoach v. Bevers*, 922 F.2d 618 (10th Cir. 1990); *Frazier v. Dubois*, 922 F.2d 560 (10th Cir. 1990).

backdrop, we think **Worrell**, which was considered by the district court in this case but not applied, provides a more appropriate framework than **Pickering**, which is inapposite.[3]

**Worrell** recognized "an alternative to the **Pickering** balancing is warranted when allegations of retaliatory conduct are directed at a defendant who is not the plaintiff's employer and when there is no contractual relationship between them." **Worrell**, 219 F.3d at 1212. In articulating **Worrell's** test, we relied on a case that factually, had nothing to do with public employment. *See **Lackey v. County of Bernalillo***, No. 97-2265, 1999 WL 2461 (10th Cir. Jan. 5, 1999).

> We . . . require[] proof of the following elements: (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

**Worrell**, 219 F.3d at 1212 (*quoting **Lackey***, 1999 WL 2461, at \*3). Other circuits follow this approach. *See generally **Carroll v. Pfeffer***, 262 F.3d 847, 850 (8th

---

[3] Although Defendants relied on **Pickering v. Board of Educ.**, 391 U.S. 563 (1968), in the district court, they maintain that they are entitled to qualified immunity even under **Worrell**, which, like **Pickering**, requires a plaintiff to prove a defendant's adverse actions were prompted by a retaliatory motive. **Worrell v. Henry**, 219 F.3d 1197, 1212 (10th Cir. 2000), *cert. denied*, 533 U.S. 916 (2001). It is Defendants' position the McCooks cannot show Defendants possessed an unconstitutional animus.

- 12 -

Cir. 2001); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999); *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

In answer to the McCooks' claim of First Amendment retaliation, Defendants acknowledge the First Amendment right to criticize public officials, *New York Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964), and to "petition the Government for a redress of grievances," are protected activities, U.S. Const. amend. I; *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967), but assert that none of the McCooks' criticisms focused on matters of "public concern," as required by *Connick*, 461 U.S. 138, and therefore none of the McCooks' speech was protected by the First Amendment. The McCooks counter that *Worrell* removed the requirement that protected speech involve matters of public concern, but, offer no legal basis to support this position. They argue in the alternative that they spoke out to inform the community and to help the public evaluate the conduct of the Springer High School administration and Board – what they characterize as matters of public concern.

> [W]hen the Supreme Court in its cases establishing and bounding the rights of public employees to exercise free speech limited those rights to speech on matters of "public concern," they did not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; they meant matters in which the public might be interested . . . . That the public was not large, that the issues were not of global significance, and that [Plaintiff's] participation was not (we mean no disrespect) vital to the survival of Western civilization [does] not place [Plaintiff's] speech outside the orbit of protection.

- 13 -

***Dishnow v. Sch. Dist. of Rib Lake***, 77 F.3d 194, 197 (7th Cir. 1996). While this conclusion was reached in reviewing the law governing public employee free speech claims, we think the Seventh Circuit's view of "public concern" is compelling on the facts of this case.

Although some of the McCooks' activities were not protected by the First Amendment, for example, filing a lawsuit to vindicate private rights (not a matter of public concern), ***Rice v. Ohio Dep't of Transp.***, 887 F.2d 716, 720-21 (6th Cir. 1989), *vacated on other grounds*, 497 U.S. 1001 (1990), we need not dwell on each criticism lodged by the McCooks. It is obvious they were, at least some of the time, "engaged in constitutionally protected activity." ***Worrell***, 219 F.3d at 1212 (citation omitted). Accordingly, we believe the district court erred in concluding the McCooks "have not engaged in protected speech for purposes of a First Amendment retaliation claim." Indeed, during oral argument, counsel for Defendants conceded, "the issue of whether or not the Plaintiffs' speech was protected is not our strong argument. . . . That is not what we . . . hang our hat on in this case."

Satisfied that the McCooks meet the first element of the ***Worrell*** test, we turn to the second: whether Defendants' actions caused the McCooks "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." ***Worrell***, 219 F.3d at 1212 (citation omitted). "Generally

speaking, government action which chills constitutionally protected speech or expression contravenes the First Amendment." ***Wolford v. Lasater***, 78 F.3d 484, 488 (10th Cir. 1996) (citations omitted).

The McCooks present a list of Defendants' adverse actions that, they argue, would chill a person of ordinary firmness from continuing to engage in his or her First Amendment rights.[4] Then, the McCooks claim Defendants' actions chilled them: they stopped going to Board meetings and Mr. McCook did not vote in what the McCooks call a "crucial" Board election. Defendants urge the record demonstrates the opposite. Both sides mistakenly assume the "chill" standard is subjective, which it is not. ***Plati***, 258 F.3d at 1177 ("The focus, of course, is upon whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled."). Taking into consideration that "inferences arising from the record before us must be drawn and indulged in favor of the party opposing summary judgment," we think the McCooks could prevail on this element as well. ***McCowan***, 273 F.3d at 921 (citation omitted).

---

[4] Among the injuries allegedly suffered by the McCooks, they assert that after Jake's expulsion, Mr. McCook moved to Arizona with Jake, and "Jake had to attend school out of state for the rest of that entire school year at considerable cost to the family." The McCooks' counsel made similar representations at oral argument. Mrs. McCook's deposition testimony states otherwise: "[Jake] went to Arizona to finish the [fall 1998] semester, . . . and then in January [1999] came to Maxwell," a high school near Springer High School.

We now turn to ***Worrell's*** third element, whether Defendants' "adverse action was substantially motivated as a response to the [McCooks'] exercise of constitutionally protected conduct." 219 F.3d at 1212 (citation omitted). It is at this juncture that the McCooks' First Amendment retaliation claim fails.

"Intent to inhibit speech . . . can be demonstrated either through direct or circumstantial evidence." ***Mendocino Envtl. Ctr.***, 192 F.3d at 1300-01 (citation omitted). Clearly though, "proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent." ***Poole v. County of Otero***, 271 F.3d 955, 962 (10th Cir. 2001) (*quoting* ***Bloch***, 156 F.3d at 682). This court has set forth a test for examining the issue of intent in the context of a summary judgment motion based on qualified immunity. First, Defendants must make "a prima facie showing of the objective reasonableness of the challenged conduct." ***Seeds v. Lucero***, 177 F. Supp. 2d 1261, 1270 (D. N.M. 2001) (*quoting* ***Gehl Group v. Koby***, 63 F.3d 1528, 1535 (10th Cir. 1995), *overruled on different issue by* ***Patel v. Wooten***, No. 00-1187, 2001 WL 788639 (10th Cir. July 12, 2001)). If Defendants meet their burden of showing objective reasonableness, we next consider whether the McCooks satisfied the "burden of presenting evidence

Defendants 'acted on the basis of a culpable subjective state of mind.'" ***Id.*** at 1270 (*quoting **Gehl Group***, 63 F.3d at 1535).[5]

In their opening brief, the McCooks offer an extensive enumeration of conduct they challenge as retaliatory. They maintain Defendants retaliated against them by:

---

[5] While this appeal was pending, we overruled ***Gehl Group's*** heightened pleading rule. ***Gehl Group v. Koby***, 63 F.3d 1528, 1535 (10th Cir. 1995), *overruled by **Patel v. Wooten***, No. 00-1187, 2001 WL 788639 (10th Cir. July 12, 2001). In ***Gehl Group***, we said,

> When state of mind is an essential element of the plaintiff's substantive claim, we have adopted a modified approach to considering a public official's qualified immunity defense on a motion for summary judgment. . . . Once the defendant has shown his or her objective reasonableness, the plaintiff's burden to establish subjective motivating animus becomes *heightened*, requiring specific and concrete evidence rather than mere speculation.

63 F.3d at 1535 (emphasis added). In overruling the heightened pleading rule, we explained,

> This circuit has previously required a plaintiff to meet a heightened pleading standard when subjective intent was an element of the substantive claim and the defendant raised a qualified immunity defense. . . . We recently held, reviewing a dismissal under Fed. R. Civ. P. 12(b)(6), that our heightened pleading requirement does not survive the Supreme Court's opinion in ***Crawford-El v. Britton***, 523 U.S. 574, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998). ***Currier v. Doran***, 242 F.3d 905, 916 (10th Cir. 2001). Even though we were reviewing a dismissal in ***Currier***, we noted that ***Crawford-El*** decided that the D.C. Circuit's heightened pleading requirement at the summary judgment stage was improper. ***Currier***, 242 F.3d at 913-14, 916. Thus, there is no question that our heightened pleading requirement at the summary judgment stage was also overturned by ***Crawford-El***.

***Patel***, 2001 WL 788639, at *2 n.2.

- 17 -

1. suspending [their] son Jake after the Plaintiffs reported Defendant Cardenas for violating the rules of the NMAA;
2. assaulting Kendall McCook when he went to the high school for a lawful purpose and using this event as grounds to expel the Plaintiffs' son;
3. filing baseless and vindictive criminal charges against Kendall McCook and his son on the day a Notice of Tort Claims was received by Defendant Cardenas;
4. prohibiting Kendall and Virginia McCook from entering onto school property at any time for any reason thus precluding attendance at Board meetings and voting in Board elections;
5. threatening the Plaintiffs with civil and criminal prosecution if they dared enter the public property of the Springer campus;
6. attempting to prevent Kendall McCook from speaking at Board meetings, changing Board policy to limit the ability of the public to voice their concerns at Board meetings and selectively enforcing that policy against Kendall McCook;
7. denying Kendall McCook employment with the Springer School District and the concomitant failure of the Board to follow the hiring mandates of state law and its own policies; and
8. expelling Jake at a hearing that was far from impartial.

After setting forth this eight-point list, the McCooks only develop several of their allegations; we thus confine our review to those specific contentions, *Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (observing that this court "will not craft a party's arguments for him"); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (citations omitted) (noting that "[a]rguments inadequately briefed in the opening brief are waived"), all of which rise from the general proposition that temporal proximity between the McCooks' criticisms and Defendants' conduct evidences Defendants' retaliatory motive.

The McCooks contest the real reason for their son's suspension had not to do with the material he downloaded, but the complaints Mr. and Mrs. McCook made. They contend the timing of their criticisms, in relation to Defendants' conduct, is telling, and "[t]iming can be circumstantial evidence of retaliatory intent." *Poole*, 271 F.3d at 961 (citation omitted). In the public employment context, "[t]his court previously has recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive [but] . . . we have rejected attempts to unduly stretch the close temporal proximity required under this standard." *Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999) (internal quotations and citations omitted).

"A five day suspension," argue the McCooks, "five months after [Jake] . . . return[ed] . . . the computer[,] was not objectively reasonable under the circumstances." Plus, Superintendent Cardenas suspended Jake four days after Mr. McCook's EEOC complaint was mailed to Defendants, and on the same day Superintendent Cardenas received Mrs. McCook's letter suggesting possible NMAA violations.[6]

Although the McCooks are careful to keep the net they cast wide, Superintendent Cardenas was the only individual responsible for Jake's

---

[6] This letter is separate and different from the "anonymous letter" allegedly written by Mrs. McCook, which the New Mexico Athletic Association (NMAA) received on October 5, 1998.

suspension. Superintendent Cardenas contends he acted in an objectively reasonable fashion in suspending Jake on the same day he heard the "South Park" clips and Jake confessed his responsibility. In the words of the district court,

> [a]lthough it is undisputed that the school laptop computer had been checked out to Jake, undisputed that Chris Sandlin [the network administrator] discovered the inappropriate material . . ., undisputed that Sandlin testified that no one told him to check out the computer, undisputed that he found inappropriate material downloaded . . . , and undisputed that Jake admitted downloading this material, Plaintiffs nevertheless contend that Cardenas' action was retaliatory.

The McCooks ineffectively attempt to dispel the district court's conclusion. Relying wholly on the timing of Superintendent Cardenas' actions, they present no persuasive evidence Superintendent Cardenas "acted on the basis of a culpable subjective state of mind." *Seeds*, 177 F. Supp. 2d at 1270 (*quoting* *Gehl Group*, 63 F.3d at 1535). The temporal proximity of the McCooks' protected speech to Superintendent Cardenas' suspension of Jake is insufficient, without more, to establish retaliatory motive. *See* *Butler*, 172 F.3d at 746 (citations omitted) ("The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive.").

The McCooks's next argue Jake's suspension was supposed to start the Monday following Homecoming weekend, but Superintendent Cardenas shifted Jake's punishment to the Friday before when Mrs. McCook accused Superintendent Cardenas of suspending her son in retaliation for the letter she

wrote to him about possible NMAA violations. Significantly, Mrs. McCook was not present when Superintendent Cardenas called Jake to his office and disciplined him. Moreover, Superintendent Cardenas testified Jake's suspension was effective immediately on Thursday, October 8, 1998. Jake's disciplinary report corroborates Superintendent Cardenas' position. Only Jake's contradictory deposition testimony gives rise to any indication there was a shift in the start date of his suspension.[7] Jake's contradictory testimony, however, is insufficient to evidence Superintendent Cardenas "acted on the basis of a culpable subjective state of mind." *Id.* at 1270 (*quoting* **Gehl Group**, 63 F.3d at 1535); *see also* **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986) (citations omitted) (In the summary judgment context, the nonmoving party "must

---

[7] During his deposition, Jake at one point, stated, "Mr. Cardenas told me that I would be suspended for five days because of this [the "South Park" clips] starting on Monday." Yet, later, in response to the question, "Mr. Cardenas told you that you were suspended immediately?" he answered:

A: Yes.
Q: Did he tell you for how long?
A: For five days.
Q: What did you understand that to mean?
A: That starting that day, I would be suspended, and it would carry over
   to the next week.
Q: And did you ask him to reconsider?
A: I asked him to admit me to the Homecoming assemblies for the
   weekend.
Q: And what did he say?
A: No.

do more than simply show that there is some metaphysical doubt as to the material facts.").

The McCooks also allege Superintendent Cardenas' October 14, 1998 letter to the McCooks was retaliatory because it was written the same day Superintendent Cardenas received the McCooks' Notice of Tort Claims and it reiterated the exclusion of Mr. McCook from Springer High School property. A plain reading of that letter, however, supports no such inference. The district court thus properly concluded: "[i]n an attempt to create inferences where there are none, Plaintiffs stretch a coincidence into an improbable dispute of fact."

The McCooks then turn to two adverse actions allegedly taken by the individual Springer Board of Education members.[8] The district court understood the McCooks' claims against the Board members were "based on personal liability

---

[8] We need not address the McCooks' allegations, raised in their reply brief, that "[t]he actions of the Board members included preventing Plaintiffs from voting, banning the McCooks from school property, [and] expelling Jake McCook." This is because the McCooks offer no factual or legal support for their conclusory allegations and because these allegations were not made in the McCooks' opening brief. *Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990) (conclusory statements are inadequate to defeat a summary judgment motion); *see also State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (stating that an issue not sufficiently raised in the opening brief is waived); Fed. R. App. P. 28(a)(9)(A) (opening brief must include "the argument, which must contain . . . appellant's contentions and reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Incidentally, the first two of these three allegations are presumably premised on the Board members' supervisory liability for the actions of Superintendent Cardenas.

as well as vague allusions to supervisory liability for Superintendent Cardenas' actions." We have held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (citation omitted).

First, the McCooks contend the individual Board members' retaliatory motives are evidenced by the fact they "disliked Kendall McCook's criticisms of them at Board meetings and in the local press." We disagree. Citing *Rakovich v. Wade*, 850 F.2d 1180, 1193 (7th Cir. 1988), the district court aptly disposed of this argument: "dislike is not an illegal motive."

Second, in December 1997, ten months prior to Jake's suspension, Board members changed the Board's public participation policy by limiting public speech at Board meetings to two minutes (from five minutes). The McCooks claim, "[t]his policy was changed two months after Kendall McCook asserted his right to speak for five minutes and criticized the Board regarding the award of the Sims scholarship to the Board President's son." Citing the record, the McCooks contend this new time limit was selectively enforced against Mr. McCook. Their citation directs our attention to deposition testimony of Christine Garcia, a regular attendant of Board meetings between January 1997 and October 1998.

Defendants counter with deposition testimony indicating the Board implemented the new policy so individual speakers would not take up the entire

evening. Janell Ross, the only Board member not sued in this action, testified the Board President obtained the time-limit idea from another school district and denied that the decision was directed at anyone in particular. Moreover, Ms. Garcia's testimony does not support the McCooks' allegation the policy was enacted in response to Mr. McCook's criticisms. Thus, we think the district court correctly determined, "there is no evidence that the change [in the time limit] was made only because of him . . . ."

Ms. Garcia's testimony is the only evidence the McCooks offer to support their allegation the Board unevenly enforced their new policy:

> Q: Do you know – when you indicated that that policy was
> unevenly enforced, who was it enforced against?
> A: Primarily Mr. McCook.
> Q: Do you know anyone else it was enforced against?
> A: No, sir.

Notwithstanding this testimony, the district court found "there is no evidence . . . it [the time limit change] was selectively enforced." As the district court recognized, Defendants concede Mr. McCook was one of the more outspoken speakers at Board meetings. Board Member Carlos Craig testified, "others once in a while interrupted [at Board meetings]," yet, as we read the record, the Board never had another occasion to enforce its new policy against anyone but Mr. McCook. There is simply no evidence anyone but Mr. McCook attempted to speak beyond the allotted time. To find retaliatory motive on the part of the

Board members, then, we would have to speculate that were another individual to test the new policy, the Board would not enforce it. Accordingly, we do not think the district court erred on this point.

Finally, because we view the McCooks' allegations through the lens of qualified immunity, our conclusion that the McCooks failed to demonstrate a constitutional violation not only renders the individual defendants entitled to qualified immunity, but also precludes our consideration of whether the law was clearly established. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

We now turn to the allegedly retaliatory acts taken by the entity defendants, the Springer Board of Education and Springer School District, neither of which are entitled to qualified immunity. *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000). For the McCooks to establish municipal liability against the entity defendants, they "must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (*citing City of Canton v. Harris*, 489 U.S. 378, 385 (1989)); *see also Seamons*, 206 F.3d at 1029. Municipal liability may not be based on either a respondeat superior or vicarious liability theory. *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir. 1996)

(*citing **Monell v. Dep't of Social Services***, 436 U.S. 658, 691 (1978)).

Nowhere in the McCooks' opening brief do they outline the retaliatory acts allegedly taken by the entity defendants, much less make the showing described in ***Hinton***.  In fact, the McCooks offer no evidence of the entity defendants' retaliatory conduct which this court may consider, and, as we have stated, we "will not craft a party's arguments for him." ***Woodward***, 199 F.3d at 1141 n.13. At any rate, we have held that where we determine individual defendants committed no constitutional violation, municipal liability may not be imposed. *See generally*, ***Butler***, 172 F.3d at 747 (citations omitted) ("Because our conclusion that the individual defendants are entitled to qualified immunity rests on the determination that none of them violated Plaintiff's constitutional rights, the City may not be found to have violated his rights."). *See also **Wilson***, 98 F.3d at 1255 (*quoting **Hinton***, 997 F.2d at 782) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").  We therefore believe the district court properly found "Plaintiffs claims of municipal liability cannot stand."

### B.  First Amendment Freedom of Assembly and Association and Fourteenth Amendment Equal Protection of the Laws

The Supreme Court has recognized,

> a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. . . .  [W]hen the

> State interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association . . . may be implicated.

***Boy Scouts of Am. v. Dale***, 530 U.S. 640, 678 (2000) (internal quotations and citations omitted). In this case, the district court focused on the issue of voting in its analysis of the McCooks' freedom of assembly and association claim. On appeal, the McCooks contend the court's focus was in error because their claim "also centered on the fact that that they were not allowed to attend Board meetings or to go on school property for any school or community event." The McCooks' argument is misplaced. Presumably, the court focused on voting because the McCooks presented no authority establishing a constitutional right to go onto school property. In the end, the district court found no merit to the McCooks' association and assembly claim since Superintendent Cardenas' exclusion of Mr. McCook "did *not*, in fact[,] prevent either Plaintiff from voting." We agree.

Contrary to Mrs. McCook's understanding that she "was barred [from the school] forever," she has voted in Springer Board of Education elections on Springer High School property twice since October 8, 1998. In her deposition she stated, "I chose to ignore it [being barred] and go up to the school and vote." Mr. McCook did not vote in 1999, but he did vote in 2000. The McCooks contend Mr. McCook only voted in 2000 because the McCooks' counsel intervened. But,

as offered by Defendants and recognized by the district court, Mr. McCook could have voted in person at the County Clerk's office or through the mail, via absentee ballot. Ultimately then, the McCooks fail to meet their threshold burden, present in summary judgment on qualified immunity grounds, of demonstrating a constitutional violation. *Hope*, 122 S. Ct. 2508; *Saucier*, 533 U.S. at 201. Their First Amendment freedom of assembly and association claim therefore fails.

The McCooks' equal protection claim is likewise unsuccessful. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (*quoting Plyer v. Doe*, 457 U.S. 202, 216 (1982)). The McCooks contend the district court mischaracterized their equal protection claim as based solely on their allegation Defendants violated their fundamental right to vote. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Rather, argue the McCooks, Defendants "arbitrarily retaliated against them in violation of their right to equal protection when they engaged in all of the retaliatory conduct set forth" throughout their briefs. They point to *Village of Willowbrook v. Olech*, and assert that they may bring a claim against Defendants as a "class of one." 528 U.S. 562, 564 (2000).

True, the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (citations omitted). But, the McCooks' only attempt at demonstrating disparate treatment is their statement, without citation to authority or the record, "the uncontroverted fact[s] [show] . . . Kendall McCook was the only one ever prohibited from speaking at a Board meeting." This bald assertion is insufficient to merit reversal of summary judgment. *Adler*, 144 F.3d at 679 (10th Cir. 1998).

## IV. CONCLUSION

The McCooks' First Amendment retaliation claim against the individual defendants is unavailing because the McCooks fail to meet their threshold burden of demonstrating a constitutional violation. Their First Amendment retaliation claim against the entity defendants is also unsuccessful. This is due to their inability to show the existence of a municipal policy or custom and a direct causal link between the policy or custom and the injury alleged. Finally, on their right of assembly and association and equal protection claims, the McCooks, here, too, fail to meet their threshold burden, present in summary judgment on qualified

- 29 -

immunity grounds.[9]  The judgment of the United States District Court for the

District of New Mexico is **AFFIRMED**.


                              ENTERED FOR THE COURT


                              John C. Porfilio
                              Senior Circuit Judge

---

[9] Appellants' Motion to Supplement the Appendix is granted.